IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>DAYTOVIANE DAPREE McLEMORE,<br><br>    Defendant. | No. CR16-2048 |

------------------------------------------------

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>JOSHUA ADAM RODE,<br><br>    Defendant. | No. CR16-2050<br><br>REPORT AND<br>RECOMMENDATION |

TABLE OF CONTENTS

I.  *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  *RELEVANT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    A.  *Was the Vehicle Stop Lawful?* . . . . . . . . . . . . . . . . . . . . . . 7
    B.  *Was the Vehicle Stop Unlawfully Prolonged?* . . . . . . . . . . . . . . 12
    C.  *Was McLemore's Pat-Down Authorized?* . . . . . . . . . . . . . . . . 17

V.  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VI.  *RECOMMENDATION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## I. INTRODUCTION

On the 5th day of December 2016, these matters came on for hearing on the Motion to Suppress (docket number 27) filed by Defendant Daytoviane Dapree McLemore on November 21, 2016, and the Motion to Suppress (docket number 19) filed by Defendant Joshua Adam Rode on November 23, 2016. The Government was represented by Assistant United States Attorney Ravi Narayan. McLemore appeared in person and was represented by attorney Melanie Keiper. Rode also appeared in person and was represented by attorney Stephen Swift. Due to time constraints, the hearing was suspended and completed on December 15. All counsel and both Defendants were present.

## II. PROCEDURAL HISTORY

On October 18, 2016, Defendant Daytoviane Dapree McLemore was charged by indictment with one count of possession of a firearm by an unlawful drug user. On the same date, Defendant Joshua Adam Rode was charged in a separate indictment with the same crime. Both charges arise from the same vehicle stop on July 1, 2016. It is my understanding the Defendants were charged separately and will be tried separately due to a potential *Bruton* issue.

McLemore appeared for an arraignment on October 24 and entered a plea of not guilty. Rode pled not guilty at his arraignment on October 27. Both cases were set for trial on December 19. Because of the pending motions to suppress, however, both trials were subsequently continued to February 21, 2017. Status conferences are set on January 25, 2017.

## III. RELEVANT FACTS

These charges arise from a vehicle stop by Waterloo Police Officer Diana Del Valle on July 1, 2016. To place the vehicle stop in context, however, it is necessary to discuss

events occurring two days earlier. On June 29, officers responded to a "shots fired" call in the 800-block area of Logan Avenue. Del Valle was riding at that time with Sergeant Kye Richter. Both Del Valle and Richter are assigned to the Violent Crime Apprehension Team ("VCAP").

Sergeant Richter testified that the 800-block area of Logan Avenue is well known for being a high crime area, with a lot of drug activity, weapons violations, "disorderlies," and other street level crimes. Officer Del Valle had previously responded to several "shots fired" calls in that area of Logan Avenue. The area was known to VCAP as the home of the L Block gang. Believing the shooting may be gang-related, Del Valle and Richter did not respond immediately to the area of the shooting, but instead drove to other areas where opposing gangs were located to look for suspicious activity.

In patrolling the area, Officer Del Valle and Sergeant Richter observed a BMW traveling southbound on East Mullan. At that time, the officers had no particular reason to believe the BMW may have been involved in the shooting. The officers saw the BMW a second time when it was parked in the "zero block" of Mulberry Street, surrounded by several people. The officers saw the vehicle a third time — approximately one hour after the shooting — in the 1000 block of Logan Avenue. According to Del Valle, two persons were seen "walking rapidly" from the vehicle to a nearby residence.[1] Richter described the persons as a "light skinned male and a darker skinned male."[2]

---

[1] Officer Del Valle was asked on direct examination whether "[a]t that time did you recognize either of those individuals?" Del Valle responded that she recognized one of them as Joshua Rode. Del Valle testified that she looked at Rode's photograph on the computer in her car as they approached the 900 block of Logan Avenue and recognized him as the person going into the house. Sergeant Richter, who was in the car with Del Valle, testified he could not recognize either person. In her report, Del Valle suggests she first learned Rode's identity later that night. I don't find the inconsistency material to the issues now before the Court.

[2] Defendant Rode is white and Defendant McLemore is African American.

3

As Officer Del Valle and Sergeant Richter neared the scene of the shooting, they stopped and questioned two females who were walking in the area. The females reported they heard shots fired in the area and saw two cars leaving the area at a high rate of speed. The vehicles were described as a coffee-colored Impala and a white Chevy Malibu. Obviously, the vehicles described by the witnesses did not match the BMW.

Officer Del Valle and Sergeant Richter then proceeded to the scene of the shooting and conferenced with other officers who were investigating. Del Valle was told by Officer Jurgenson that he had just learned Rode had been shot at near his home a couple of days earlier, and the June 29 shooting may have been in retaliation.[3] Del Valle was told that Rode, who is believed to be associated with the L Block gang, lives at 1025 Logan Avenue (the house Del Valle saw him entering). The shooting which allegedly occurred a couple of days earlier was not reported to authorities and was not investigated by the police.

Officer Ullom advised Sergeant Richter and Officer Del Valle that he had seen a BMW going the wrong way on a one-way street as he neared the scene of the shooting, but did not stop the vehicle because Ullom was responding to the shots fired. The BMW was seen about four or five blocks from where the shooting took place. Del Valle retrieved information regarding Rode, including his photograph, from the computer in her car. Authorities did not attempt to question Rode on June 29 regarding either shooting.

Two days later, on July 1, Sergeant Richter was patrolling the area and observed Daytoviane McLemore standing outside the BMW in the driveway at 820 Logan Avenue. Richter knew McLemore from prior dealings. Richter believed McLemore to be a member of the L Block gang. In January 2016, officers executed a search warrant at the house of Defendant's mother, Star McLemore, and found evidence allegedly associated

---

[3] This theory is confusing to me. Rode is believed to be associated with the L Block gang and lives nearby. If the June 29th shooting was in "retaliation" for Rode being shot at earlier, then it seems more likely the shooting would have occurred in an area occupied by a rival gang.

with Daytoviane which was consistent with the sale of marijuana. A subsequent search of McLemore's phone revealed evidence of buying and selling guns, and buying and selling marijuana.

Sergeant Richter instructed Officer Del Valle to "come to the area and kind of just linger" until the vehicle left. Del Valle proceeded to the area and parked one block north of where the BMW was parked. Del Valle observed the BMW leave and followed it. Del Valle testified that "our interest in the vehicle came from that June 29th incident and the fact that the vehicle was at 820 Logan, which is a residence we know L Block members hang out at was probably what caught his attention and he relayed that information to me."

As Officer Del Valle was following the BMW, Sergeant Richter and Officer Sullivan, who was riding with him, conducted an unrelated traffic stop. Del Valle told Richter on the radio that she had seen "no violations yet." Sullivan asked Del Valle about the license plate. The BMW had a dealer advertising plate where the metal plate would generally be located, with a temporary paper plate in the back window.[4] Del Valle told Sullivan that "you can see a plate, but you can't read what's on it." Sullivan responded "there you go."[5]

Officer Del Valle testified that she followed the car for "about a block-and-a-half," drove within seven to ten feet of the BMW, and could still not read the paper plate. When asked on cross-examination whether she used her spot light, Del Valle testified it was "likely," but "I'm not sure." She did not use her high beams. Del Valle then pulled the BMW over at approximately 10:00 p.m. According to Del Valle, she could not read the paper plate until she approached the vehicle and was standing next to the trunk. As she

---

[4] 'Photos of the temporary plate and advertising plate were introduced as McLemore Exhibits E and F.

[5] The conversation can be heard on McLemore Exhibit A.

approached the car, Del Valle's focus was on the two occupants of the car, and she did not look at the paper plate or determine whether the paper plate appeared to be valid. She subsequently determined it was a valid DOT temporary registration card, presumably affixed by the dealer. Del Valle testified that as she "approached" the car she could smell "an odor of fresh marijuana." In her report, however, Del Valle wrote that "[i]n speaking with Rode, I detected an odor of fresh marijuana coming from the vehicle."[6]

As she approached the vehicle, Officer Del Valle recognized both Rode and McLemore.[7] Del Valle had several dealings with McLemore over the past year, including an incident in April 2016 when McLemore was the victim of a shooting.[8] Prior to that, Del Valle had obtained a search warrant for McLemore's phone and discovered text messages relating to the purchase and sale of guns. Del Valle's knowledge of Rode was only acquired as part of the investigation of the June 29th shootings.

Rode was extremely nervous, his hands were visibly shaking, he was breathing rapidly, and his voice was "cracking." It also appeared to Sergeant Richter that Rode attempted to conceal the contents of the glove box when retrieving the vehicle's purchase documents. Both Rode and McLemore were required to exit the vehicle. Richter patted McLemore down and found a gun on his person.

## IV. DISCUSSION

In their motions to suppress, Defendants raise three arguments. First, Defendants argue that Officer Del Valle lacked probable cause or reasonable suspicion to stop the

---

[6] Supplemental Incident Report of Diana Del Valle (McLemore Exhibit B) at 1.

[7] Officer Del Valle testified she did not know who was in the car prior to pulling it over. Sergeant Richter testified, however, that he had seen McLemore standing next to the car and it was owned by Rode, so he assumed Rode and McLemore were in the car when Del Valle reported she was following it.

[8] According to Officer Del Valle, another member of the L Block gang hit the mother of an opposing gang member and the shooting was in retaliation. McLemore was not believed to be the target. Del Valle opined that McLemore was "in the wrong place at the wrong time."

vehicle in which they were riding. Second, Defendants argue that even if the vehicle stop was constitutionally permitted, the scope of the detention exceeded that permitted by *Terry*. Third, both Defendants assert that Sergeant Richter lacked a reasonable suspicion that McLemore was armed and dangerous and, therefore, the protective pat-down of his person violated the Constitution.

## A. Was the Vehicle Stop Lawful?

The law regarding vehicle stops is well-established, and was recently summarized by the Eighth Circuit Court of Appeals:

> The Fourth Amendment prohibits unreasonable searches and seizures. A traffic stop constitutes a seizure of a vehicle's occupants, including any passengers. A traffic stop must be supported by reasonable suspicion or probable cause. A law enforcement officer has reasonable suspicion when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed. Any traffic violation, however minor, provides probable cause for a traffic stop. The determination of whether probable cause, or reasonable suspicion, existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time.

*United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012) (internal quotations and all citations omitted). The Government argues that Officer Del Valle had an "objectively reasonable suspicion that the vehicle did not have a clearly legible license plate."[9] Alternatively, the Government argues that there was an objectively reasonable suspicion that other unspecified criminal activity was afoot.

Iowa Code § 321.25 permits a vehicle to be lawfully operated for a period of 45 days after the date of delivery of the vehicle to the purchaser from the dealer, "if a card

---

[9] Government's Brief (docket number 24-1) at 1.

bearing the words 'registration applied for' is attached on the rear of the vehicle." It is undisputed that Rode had recently purchased the BMW and the temporary registration card in the rear window was validly issued by the dealer and properly displayed in compliance with § 321.25. However, because Officer Del Valle was unable to read the paper plate, the Government argues there was reasonable suspicion to believe that it may not comply with § 321.25.

Courts have wrestled with the question of whether the inability to read a temporary paper plate authorizes an officer to conduct a traffic stop. In *United States v. Givens*, 763 F.3d 987 (8th Cir. 2014), a case arising in the Northern District of Iowa, the Court considered facts which are nearly identical to those presented here:

> While stopped at a stop sign at approximately 2:00 a.m. on October 7, 2010, Officer Nathan Baughan of the Cedar Rapids Police Department observed a vehicle driven by Givens pass in front of him that did not have registration plates. Officer Baughan turned to follow the vehicle and saw what appeared to be a temporary paper registration card in the rear window, but he could not read it due to the angle of the window and the darkness of the night.

*Givens*, 763 F.3d at 988. Similarly, Officer Del Valle observed the BMW had a dealer advertising plate where the permanent registration plate would otherwise be displayed. Del Valle also observed what appeared to be a temporary paper plate in the rear window, but she could not read it. It was dark (the stop occurred at approximately 10:00 p.m.) and photographs of the vehicle show the rear window has a substantial angle. *See* McLemore Exhibit E.

The *Givens* Court noted that "[o]perating a vehicle on the highway without displaying valid registration plates or a temporary paper registration card amounts to a simple misdemeanor." *Id.* at 990 (citing Iowa Code § 321.98). Givens argued that because the officer could not read the temporary registration card, "he could not

reasonably suspect that the card was forged, altered, out of date, or otherwise illegal." *Id*. The Court rejected Givens' argument, however, noting that while the officer could see what "appeared" to be a temporary paper registration card, he "did not know whether the paper was in fact a registration card." *Id*. The Court found that this was "critical, particularly because we have previously upheld a traffic stop under conditions where a vehicle did not display a metal license plate and the officer saw only what appeared to be a paper tag posted in the rear window, but did not know whether the paper affixed to the window was a valid registration tag." *Id*. (citing *United States v. Mendoza*, 691 F.3d 954, 959 (8th Cir. 2012)). It should be noted, however, that the paper tag in *Mendoza* had what the officer believed was a suspicious color scheme, and the officer was "confident that it was not an Iowa temporary tag." *Mendoza*, 691 F.3d at 959.

The Court in *Givens* concluded that "it was objectively reasonable for Officer Baughan to expect that a properly displayed valid registration card would be readable from his location." *Givens*, 763 F.3d at 990.

> Because he could not decipher any information on the paper affixed to the rear window, Officer Baughan reasonably suspected that the vehicle lacked valid registration. It is not uncommon for officers to stop vehicles due to the lack of an apparent temporary registration tag, and such stops are generally upheld as supported by reasonable suspicion.

*Givens*, 763 F.3d at 990 (citing *United States v. Edgerton*, 438 F.3d 1043, 1047-48 (10th Cir. 2006); *United States v. Tipton*, 3 F.3d 1119, 1122 (7th Cir. 1993)). The Court concluded that "because Givens's vehicle did not have metal license plates and lacked a readily apparent temporary paper registration card, Officer Baughan had reasonable suspicion that the vehicle did not comply with state law." *Id*. at 991.

In support of their argument, however, Defendants in the instant action cite *United States v. Wilson*, 205 F.3d 720 (4th Cir. 2000), a case considered and distinguished by the

*Givens* Court. Wilson was driving a car with a temporary paper license tag placed by the dealer in compliance with North Carolina law. While traveling in South Carolina, an officer noticed the car had a North Carolina temporary tag, and he began following it. It was dark, and the officer was unable to read the expiration date on the tag. He saw nothing illegal about the tag or the operation of the car, but stopped the vehicle "[s]olely because he could not read the handwritten expiration date 'in the bottom little corner of the paper tag.'" *Id.* at 722. The Fourth Circuit Court of Appeals concluded the officer lacked reasonable suspicion that there was anything illegal about the temporary tag. The Court concluded that "[t]he Fourth Amendment does not allow a policeman to stop a car just because it has temporary tags." *Id.* at 724.

The Court in *Givens* distinguished *Wilson*, however, because the officer in *Givens* could not determine whether the paper affixed to the rear window was in fact a temporary registration card.

> Unlike the officer in *Wilson*, who observed a valid temporary tag but simply could not read the expiration date, Officer Baughan could not determine whether the paper affixed to the rear window of Givens's vehicle was in fact a temporary registration card. Moreover, Officer Baughan indicated that he is often able to read temporary cards at night despite dark conditions. This directly contrasts with the officer in *Wilson* who admitted that the inability to completely read temporary tags was common in his experience, making suspicion of wrongdoing less likely in that case.

*Givens*, 763 F.3d at 991. Here, the record is silent regarding Officer Del Valle's prior experience with being able to read temporary cards at night. I believe *Givens* provides authority, however, for the proposition that if an officer can only see what *appears* to be a temporary registration card in the rear window, then he or she may conduct a traffic stop to determine whether, *in fact*, it is a valid temporary registration tag. *Id.* (when a vehicle

lacks "a readily apparent temporary paper registration card," then the officer has "reasonable suspicion that the vehicle did not comply with state law").

Defendants argue that the reason given by Officer Del Valle for stopping the vehicle was mere pretext.[10] It is clear that Sergeant Richter targeted the BMW because of its possible involvement in the shooting two days earlier. Richter knew it was Rode's car and saw McLemore standing next to it on July 1. Richter then contacted Del Valle and instructed her to conduct surveillance.

The mere fact that the officers may have had an ulterior motive in conducting the traffic stop does not make the stop unconstitutional if the officer otherwise has probable cause or reasonable suspicion of a law violation. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *United States v. Gunnell*, 775 F.3d 1079, 1083 (8th Cir. 2015) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

> A pretextual traffic stop violates the Fourth Amendment. It is well established, however, that any traffic violation, no matter how minor, provides a police officer with probable cause to stop the driver of the vehicle. To determine whether a stop was based on probable cause or was merely pretextual, we apply a "standard of 'objective reasonableness.'" *So long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of determining the lawfulness of the stop.*

*United States v. Pereira-Munoz*, 59 F.3d 788, 791 (8th Cir. 1995) (internal citations omitted) (emphasis added). *See also United States v. Eldridge*, 984 F.2d 943 (8th Cir.

---

[10] At the hearing, Officer Del Valle was asked why the recordings between herself and Sergeant Richter were incomplete, and she responded: "Because Sergeant Richter advised he covered the initial pretext of the stop." Hearing Transcript (McLemore docket number 37) at 39:17-18. In responding to the next question, however, Del Valle is apparently referring to information that was not included in her report. In any event, it does not appear that Del Valle was using the term "pretext" as a term of art.

1993); *United States v. Coney*, 456 F.3d 850, 855-56 (8th Cir. 2006) (an officer may conduct a traffic stop for a minor traffic violation "even if a valid traffic stop is a pretext for other investigation").

In summary, Officer Del Valle credibly testified she was unable to read what appeared to be a temporary registration card in the window of the BMW. McLemore's Exhibit E supports her testimony in that regard. Given the angle of the rear window, the placement of the temporary registration card, and the lighting conditions, I believe Del Valle was unable to read the paper plate until after she stopped and approached the vehicle. The officer in *Givens* stopped a vehicle under similar circumstances. The Court in *Givens* concluded that no constitutional violation occurred. *Givens*, 763 F.3d at 991 ("because Givens's vehicle did not have metal license plates and lacked a readily apparent temporary paper registration card, Officer Baughan had reasonable suspicion that the vehicle did not comply with state law"). For the same reason, I believe Officer Del Valle's stop of the BMW was constitutionally permitted.[11]

### B. Was the Vehicle Stop Unlawfully Prolonged?

Next, Defendants argue that the vehicle stop "exceeded the permissible scope of a *Terry* stop." In their briefs, Defendants argue that "after determining that Rode was legal to drive, that he had the purchasing papers for the car, and that there were no outstanding warrants for his arrest, the legitimate investigative purposes of the traffic stop were completed."[12] At the hearing, however, McLemore's counsel argued for the first time that

---

[11] Because I believe there was reasonable suspicion regarding the validity of the temporary registration card, I find it unnecessary to address the Government's alternative argument that there was reasonable suspicion to believe the occupants of the vehicle were engaged in other unspecified criminal activity. If I were to address that argument, however, I would reject it. Simply because the BMW and its occupants may have been involved in the shooting on June 29 does not establish reasonable suspicion to believe they were engaged in criminal activity on July 1.

[12] McLemore Brief (docket number 27-1) at 6. Rode filed an identical brief.

the purpose of the stop was completed *before* Officer Del Valle approached Rode. That is, Defendants now apparently argue that when Del Valle approached the rear of the BMW on foot and could read the temporary registration card, it was necessary for her to immediately return to the squad car and abandon the traffic stop.

In *Rodriguez v. United States*, _____ U.S. _____, 135 S. Ct. 1609 (2015), the Court recognized that "[a] seizure for a traffic violation justifies a police investigation of that violation." *Id.* at 1614. "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id.* (internal citation omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are — or reasonably should have been — completed." *Id.*

Officer Del Valle testified that when she approached the vehicle her attention was on the two occupants — whom she recognized as Rode and McLemore — and she did not immediately inspect the temporary tag. It is undisputed, however, that she would have been able to read the temporary registration card when she was near the trunk of the BMW. While not citing *Rodriguez*, Defendants presumably argue that the "mission" of the stop was completed when Del Valle approached the vehicle and was able to read the temporary registration card. The Government did not cite *Rodriguez* either, but presumably argues that an "investigation" into whether the temporary card was valid would include questioning the driver.

Neither party cited any authority on the issue of whether an officer may approach a driver during a traffic stop when the probable cause or reasonable suspicion for the stop has dissipated prior to speaking with the driver. The Court has searched for Eighth Circuit authority on this issue and has found none. The Iowa Supreme Court addressed this issue in *State v. Jackson*, 315 N.W.2d 766 (Iowa 1982). There, the defendant's car was stopped by a sheriff's deputy because it bore no license plates. "Upon being alerted to the reasons

for the stop, defendant directed the officer's attention to a properly displayed department of transportation paper plate." *Id.* at 767. After the driver was unable to produce a valid driver's license, he was charged with operating a motor vehicle under suspension. After concluding that the vehicle was properly stopped, the Court also concluded that the driver was properly questioned. "When the department of transportation paper plates were pointed out to the officer there arose no requirement that he treat the defendant as if he had never seen him." *Id. But see State v. Coleman*, 884 N.W.2d 223 (Iowa App. 2016) (table) (questioning the continuing validity of the decision in *Jackson*).

In *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006), the Court concluded that the trooper properly stopped the defendant's vehicle "not only because he could not read its temporary registration tag while following at a safe distance, but also because he could not determine whether the document posted in the rear window was, in fact, a temporary tag." *Id.* at 1047. Nonetheless, the Court concluded that the defendant's motion to suppress should have been granted because as the trooper approached the vehicle on foot he was able to establish the validity of the temporary tag. At that point, according to the Tenth Circuit Court of Appeals, the trooper "as a matter of courtesy, should have explained to Defendant the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration." *Id.* at 1051. The Court recognized, however, "the possibility in similar circumstances that the brief encounter between an officer and driver authorized by *McSwain* might independently give rise to facts creating reasonable suspicion of criminal activity, thus warranting further investigation." *Id.*

In *Givens*, the officer exited his vehicle and upon reaching the rear window determined that the paper in the window was a valid temporary registration card. 763 F.3d at 988-89. "However, by that time, he smelled the odor of marijuana emanating from the vehicle." *Id.* Accordingly, the officer was justified in continuing his investigation and

questioning the driver. In the instant action, Officer Del Valle smelled the odor of fresh marijuana, but only *after* "speaking with Rode."

The "mission" of the traffic stop in this case was to determine whether the BMW was displaying a valid temporary registration card. I believe an investigation of that issue requires more than simply glancing at the card and judging its apparent validity. In my view, under these circumstances, an appropriate investigation includes speaking with the driver, determining whether the vehicle was recently purchased, and establishing the apparent validity of the temporary registration card. Accordingly, Officer Del Valle's "mission" was not complete until she spoke with the driver and, therefore, approaching the driver did not improperly prolong the stop or violate the holding in *Rodriguez*.

Even *if* one concludes that the mission of the stop was complete after viewing the temporary registration card in the window, I could not find any authority which would require the officer to simply turn on his or her heel and return directly to the squad car. That is, *Edgerton* — which held a driver could not be required to produce her driver's license — found that "as a matter of courtesy," the officer should have explained to the driver the reason for the stop. While *Edgerton* held the officer was not permitted to require the driver to produce a license and registration as a part of the initial stop, it recognized the possibility that circumstances during the brief encounter between the officer and the driver "might independently give rise to facts creating reasonable suspicion of criminal activity, thus warranting further investigation." 438 F.3d at 1051.

"An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002). Here, Officer Del Valle observed that Rode was extremely nervous, his hands were visibly shaking, he was breathing rapidly, and his voice was "cracking." Furthermore, in speaking with Rode, Del Valle detected an odor of fresh marijuana coming from the vehicle. At the least, the

odor of marijuana authorized Del Valle to expand her investigation. *United States v. Caves*, 890 F.2d 87, 91 (8th Cir. 1989) (noting that the odor of marijuana alone was enough to justify a search of the vehicle). Sergeant Richter was then authorized in asking McLemore to exit the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) ("An officer making a traffic stop may order passengers to get out of the car pending completion of the stop").

Also instructive is the recent opinion by the Illinois Supreme Court in *People v. Cummings*, 46 N.E.3d 248 (Ill. 2016). There, an officer pulled over a van because there was a warrant out for the arrest of the van's female registered owner. Upon approaching the van, however, the officer saw that the driver was a man and could not be the person for whom the warrant was issued. Nonetheless, the officer asked the driver for his driver's license, and the driver was subsequently cited when it was discovered his license was suspended. The case raised the issue of "whether asking for a driver's license in a lawfully initiated stop, without reasonable suspicion of a traffic violation or that the driver is subject to arrest, violates the fourth amendment by impermissibly prolonging the stop." *Id.* at 249. Initially, the Illinois Supreme Court concluded that "once [the officer's] reasonable suspicion evaporated, the request for identification was unrelated to the reason for the stop, and it impermissibly extended the stop." *Id.* The state appealed, and the Supreme Court remanded following its decision in *Rodriguez*. On remand, the Illinois Supreme Court unanimously concluded that asking the driver for his driver's license did not impermissibly prolong the stop. "Though his reasonable suspicion the driver was subject to arrest vanished upon seeing defendant, [the officer] could still make the ordinary inquiries incident to a stop." *Id.* at 252-53. *See also United States v. Tipton*, 3 F.3d 1119, 1123 (7th Cir. 1993) (concluding the officers were not "obliged to abort the stop even if they had noticed the improperly affix sticker prior to questioning").

In summary, I do not believe the "mission" of the stop was completed when Officer Del Valle walked up to the BMW and would have been able to read the temporary registration card. Instead, I believe an appropriate investigation would have allowed her to speak with the driver. Even *if* the mission of the stop was completed at that time, however, I could find no authority for the argument that Del Valle was required to simply return to her squad car. *Edgerton* suggested that under similar circumstances the officer should approach the driver and explain the reason for the stop. Either way, when Del Valle approached Rode, observed his demeanor, and smelled the odor of fresh marijuana, there was reasonable suspicion of criminal activity and she was authorized to expand the vehicle stop. I find no constitutional violation.

## C. Was McLemore's Pat-Down Authorized?

Next, Defendants argue that Sergeant Richter lacked a reasonable suspicion that McLemore was armed and dangerous and, therefore, the protective pat-down search was unconstitutional.[13] To justify a pat-down of a passenger during a traffic stop, the officer "must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). The "sole justification" of a pat-down search is "the protection of the police officer and others nearby." *Terry v. Ohio*, 392 U.S. 1, 29 (1968). The *Terry* Court concluded that for the protection of the police officer, he may search for weapons "where he has reason to believe that he is dealing with an armed and dangerous individual." *Id.* at 27. *See also United States v. Davison*, 808 F.3d 325, 329 (8th Cir. 2015). The Court employs an objective test in determining whether an officer may have reasonable suspicion that a person with whom they are dealing might be armed and dangerous. *United States v. Preston*, 685 F.3d 685,

---

[13] None of the parties addressed the issue of whether Rode has standing to challenge the constitutionality of the pat-down search of McLemore.

689 (8th Cir. 2012). In determining whether reasonable suspicion exists, the Court considers "the totality of the circumstances in light of the officers' experience and specialized training." *Id.* "A pat-down is permissible if a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id.* (quoting *United States v. Horton*, 611 F.3d 936, 941 (8th Cir. 2010) (in turn quoting *Terry*, 392 U.S. at 27.).

With these general principles in mind, I now turn to the facts in the instant action. *Oliver*, 550 F.3d at 735 (noting that determining whether an officer had reasonable suspicion to believe a person was armed and dangerous is a "fact-intensive issue of law"). Here, Sergeant Richter knew that both Rode and McLemore are associated with the L Block gang. Gang affiliation is a factor the Court may consider in determining whether it was reasonable to believe McLemore was armed and dangerous. *United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995) ("Knowledge of gang association and recent relevant criminal conduct, while of doubtful *evidentiary* value in view of the strictures against proving guilt by association or by a predisposition based on past criminal acts, it is a permissible component of the articulable suspicion required for a *Terry* stop.") (quoted with approval in *United States v. Roelandt*, 827 F.3d 746, 749 (8th Cir. 2016)). As a member of the Violent Crimes Apprehension Team, Richter knew that the L Block gang had been feuding with opposing gangs in Waterloo. There was a shooting just two days earlier, with 8-10 shots fired, in the area where Rode and McLemore lived. A few days before that, Rode had allegedly been shot at near his home. Two months earlier, McLemore was shot in the foot as he was standing in front of his home. Furthermore, Richter knew from an earlier search of McLemore's phone that McLemore may be involved in the buying and selling of guns.

Prior to ordering Rode and McLemore to exit the vehicle, Officer Del Valle smelled the odor of fresh marijuana coming from the vehicle. An earlier search of the residence

where McLemore was living, and a subsequent search of his phone, suggested McLemore may be distributing marijuana. "It is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction." *United States v. Gaffney*, 789 F.3d 866, 870 (8th Cir. 2015) (quoting *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005)). Moreover, Rode appeared extremely nervous. Extreme nervousness may bolster an officer's belief that a subject may be armed and dangerous. *Gaffney*, 789 F.3d at 870 (quoting *United States v. Hanlon*, 401 F.3d 926, 930 (8th Cir. 2005)). Furthermore, it appeared to Sergeant Richter that Rode was attempting to conceal the contents of the glove compartment as he reached for the car's purchase papers.

The level of suspicion necessary to justify a protective pat-down search "is considerably less than proof of wrongdoing by a preponderance of the evidence" and "is obviously less demanding than that for probable cause." *United States v. Roggeman*, 279 F.3d 573, 578 (8th Cir. 2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "Traffic stops are 'especially fraught with danger to police officers,' so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 135 S. Ct. at 1616 (internal citation omitted). Given all of the circumstances, I believe that a "reasonably prudent man" would be warranted in believing that his safety or the safety of others may be in danger. *Terry*, 392 U.S. at 27. Accordingly, I believe Sergeant Richter was authorized to conduct a protective pat-down for officer safety.

## V. CONCLUSION

Because she could not read what appeared to be a temporary registration card, Officer Del Valle stopped the BMW to determine whether it was validly issued. Under nearly identical circumstances, the Eighth Circuit Court of Appeals held in *Givens* that the officer "had reasonable suspicion that the vehicle did not comply with state law."

763 F.3d at 991. Accordingly, I believe the vehicle stop complied with the "reasonable suspicion" requirement of the Fourth Amendment.

Officer Del Valle would have been able to read the temporary registration card as she approached the vehicle, although her focus at that time was on the occupants. Even though the temporary registration card appeared to be genuine, I believe an appropriate investigation would have included questioning the driver about the apparent recent purchase of the vehicle. Even *if* one concludes that the "mission" of the stop was completed when Del Valle was able to read the temporary registration card, she was nonetheless permitted to approach the driver and ask routine questions. The scope of the stop was then expanded after Del Valle smelled the odor of fresh marijuana and observed Rode's demeanor.

Finally, the officers were authorized to order both the driver and the passenger out of the vehicle. For the reasons detailed above, Sergeant Richter had a reasonable suspicion that McLemore might be armed and dangerous. Accordingly, Richter was justified in conducting a protective pat-down search for his safety and the safety of others.

In summary, I find no constitutional violations in the vehicle stop, the scope of the stop, or the pat-down of McLemore. I respectfully recommend that the motions to suppress filed by Defendants be denied.

## VI. RECOMMENDATION

For the reasons set forth above, I respectfully that the Motion to Suppress (docket number 27) filed by Defendant Daytoviane Dapree McLemore and the Motion to Suppress (docket number 19) filed by Defendant Joshua Adam Rode be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription*

*of all portions of the record the district court judge will need to rule on the objections."*
*Accordingly, if the parties are going to object to this Report and Recommendation, they*
*must promptly order a transcript of the hearing held on December 5 and 15, 2016.*

DATED this 21st day of December, 2016.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA